**Harold S. GOLDEN and David Fincher, Plaintiffs,**

v.

**BISCAYNE BAY YACHT CLUB, CITY OF MIAMI, a political subdivision of the State of Florida, et al., Defendants.**

**No. 72-819-Civ-NCR.**

United States District Court, S. D. Florida, Miami Division.

Dec. 31, 1973.

**1040**

Maurice Rosen, North Miami Beach, Fla. (Warren S. Schwartz. Miami Beach, Fla., of counsel), for plaintiffs.

Henry Burnett, Fowler, White, Humkey, Burnett, Hurley & Banick, P. A., Alan H. Rothstein, City Atty., and L. Joseph Hoffman, Sp. Counsel, Miami, Fla., for City of Miami.

ROETTGER, District Judge.

Plaintiffs, Harold S. Golden and David Fincher, a Jew and a Black respectively, brought suit against defendant Biscayne Bay Yacht Club challenging the admission policies of the Club pursuant to Title 42 U.S.C. sections 1981, 1983 and 2000a. While originally filed as a class action, the class action allegations were stricken by the court for failure to meet the requisites of Rule 23 of the Federal Rules of Civil Procedure.

The City of Miami, its mayor and commissioners, have also been named as defendants by virtue of a city ordinance prohibiting discrimination by lessees of city-owned property.

In addition to evidence received at the trial, the court viewed the Yacht Club premises with counsel for the parties and makes the following findings of fact and reaches the following conclusions of law:

## FINDINGS OF FACT

Defendant Biscayne Bay Yacht Club was organized in 1887 to provide a meeting place for yachtsmen in early Miami.[1] In 1932, the Club purchased its present clubhouse located at 2540 South Bayshore Drive, Coconut Grove, which is adjacent to Biscayne Bay. In 1962, by virtue of a 1949 deed from The Trustees of the Internal Improvement Fund of the State of Florida, the City of Miami asserted ownership to the bay bottom land abutting the Club's property and, since that time, the Club has leased this bay bottom land from the City at an annual rental of $1.00.[2] The Club had utilized the bay bottom land previously by docks extending from the bulkhead line and after 1969 extended the piers. The docks provide for the mooring of boats for members but the general public is prohibited from tying up there. This Club is not like a number of yacht clubs whose docks appear to be a mere appendage to the club's social activities and clubhouse. Quite to the contrary, this bay bottom land is essential to the Club's functioning as a yacht club. Except for the existence of the lease, the City of Miami has never participated in or been involved in the operation of the Club.

In 1969 the City of Miami petitioned the Trustees of the Internal Improvement Fund of the State of Florida for a waiver of use restrictions[3] limiting the use of the land "solely for public purposes." In their waiver of deed restrictions, the Trustees allowed construction of the piers by the Club to "help relieve the accute (sic) shortage of *public* dock facilities existing in the City of Miami." (Emphasis that of court).

The City of Miami has enacted certain laws dealing with the rental of city-owned property. One section of the Miami City Code prohibits any lessee of city-owned property from discriminating against persons on the basis of race, religion, color or national origin.[4] Anoth-

---

1. At its inception, the Biscayne Bay Yacht Club was the southernmost yacht club in the United States. The Club's flag signifies this historical fact by bearing the emblem of a large N interlaced with the figures 25 signifying 25 degrees north latitude.

 For an interesting account of the early days of the Club, see H. Muir, Miami, U.S.A. (2d ed. 1963)

2. Neither side has raised the issue of whether riparian rights were vested in the Club prior to 1962.

3. The restriction provides that the land not be used for private purposes "as distinguished from any public or municipal use or purpose."

4. Miami, Fla.Code § 38–9.1 provides:

 The lessee of any property of which the city is the owner shall not discriminate against or refuse or deny to any person or persons, guests or permittees, the use of the facilities leased from the city because of race, creed, religion, color or national origin. (Ord. No. 7668, § 1)

er provides that where the lessee is a club, there shall be no requirement that applicants be sponsored as a condition for club membership.[5] These provisions are incorporated into every lease between the City and its lessees, including the lease under consideration.[6]

Membership in the Biscayne Bay Yacht Club is by sponsorship only. The By-Laws of the Club provide for invitation to membership by three sponsors consisting of a proposer and two seconders who file with the Club's secretary letters stating the candidate's qualifications for membership. These letters are accompanied by the candidate's application form which is prepared by one of the sponsors. The Secretary sends out notices to all members of the proposal for membership and any member wishing to do so may write a letter or personally appear before the membership committee to express his views regarding the candidate. All such letters are subsequently destroyed.

After "due investigation" required by the Club's By-Laws, a vote by secret ballot is held by the Board of Governors sitting as the membership committee. At least eight members are needed for a quorum. If any three members of the committee veto the candidate, no invitation is issued. The Club meets the test of being a private club and it certainly was not formed as a subterfuge to evade the civil rights laws. Stout v. Y. M. C. A. of Bessemer, Ala., 404 F.2d 687 (5th Cir. 1968); Nesmith v. Y. M. C. A. of Raleigh, N. C., 397 F.2d 96, 102 (4th Cir. 1968); Wright v. Cork Club, 315 F.Supp. 1143, 1153 (S.D.Tex.1970).

Since 1962, the Club has set a maximum membership of 250. The By-

Laws neither expressly prohibit the presence or use of the facilities by guests of members nor do they expressly forbid membership by members of the Jewish faith or Black race. No known present or past members of the Club have been either Jewish or Black with the exception of one honorary Black member, the commodore of the Jamaica Yacht Club. The Club vigorously asserts it does not, and has not, engaged in discriminatory practices.

On February 18, 1969, plaintiff Golden sent a letter to the then commodore of the Biscayne Bay Yacht Club requesting an application for membership. A response was sent to plaintiff six days later informing him that membership was by sponsorship only. On January 14, 1972, plaintiff Fincher expressed his interest in joining the Club but was likewise refused. No proposal for membership pursuant to the By-Law provisions was ever submitted on behalf of either plaintiff.

As a result, plaintiffs brought suit for declaratory and injunctive relief, specifically requesting the court to declare that defendant Club has violated the Fourteenth Amendment to the United States Constitution and that it be enjoined from further barring of members on account of race or religion. The Amended Complaint also requested the court to enjoin the City of Miami from leasing its land to the Club until the Club ceased its discriminatory membership policies.

## CONCLUSIONS OF LAW

*Jurisdiction:*

The court has jurisdiction of this case under Title 28 U.S.C. sections 2201 and 2202 through the provisions of Title

---

5. Miami, Fla.Code § 38–9.2, sub. § A. II states:

> There shall be no requirement that applicants for enrollment be sponsored by anyone as a condition to such applicant being processed or accepted for membership. (Ord. No. 7668, § 2; Ord. No. 7682, §§ 1, 2.)
>
> However, no evidence was brought before the Court indicating the City knew the

Club's membership policy was one of sponsorship only and which would have served as a primary reason for the Court awarding relief against the City.

6. Miami, Fla.Code § 38–9.3 (Ord. No. 7668, § VI, sub. § 3)

28 and section 1343(3) which gives the court jurisdictions over violations of Title 42 U.S.C. § 1983 where the violation occurs under color of state law or authority.

*Standing:*

█ Defendant Club argues that plaintiffs cannot contest the membership policies of the Club since, never having been proposed for membership, they have suffered no injury. Both plaintiffs, upon expressing an interest in joining the Club, were told that there was nothing either could do without recommendation and this served as a sufficient rejection to give them the standing to challenge the membership policies of the defendant Club. See, e. g., Solomon v. Miami Woman's Club et al., 359 F. Supp. 41 (S.D.Fla.1973).

*Color of Law:*

█ While the parties have stipulated that defendant is a private club, the fact that a club is private does not always mean that it is exempted from the operation of the Civil Rights Act. Title 42 U.S.C. § 2000a; Smith v. Y. M. C. A. of Montgomery, Inc., 462 F.2d 634 (5th Cir. 1972). Private conduct abridging individual rights does fall within the prohibitions of the Fourteenth Amendment when the state to some significant extent has been found to have become involved in it. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

█ In this case, the City of Miami leases publicly owned land to the defendant Club so that the Club may operate as a yacht club and provide dockage for its members. Here, the court is not faced with the "periodic" or incidental use of municipally owned recreational facilities as in the recent case of Gilmore v. City of Montgomery, 473 F.2d 832 (5th Cir. 1973). Rather, the lease

under issue is on a *permanent* basis and, unlike the facilities in *Gilmore,* cannot be used by anyone other than Club members and their guests.

Neither is the court faced with the minimal degree of state involvement present in the recent Supreme Court's decision in this area, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973). In *Moose Lodge,* the issuance of a liquor license to the discriminating Club was the only nexus with the state. No special benefit by reason of the liquor license was afforded the Club by the state since, like other state furnished services such as police and fire protection, water and electricity the benefits of a liquor license were potentially available to all state citizens. Here, however, the defendant Club enjoys a select privilege not available to each citizen but one coveted by many citizens in the South Florida area. More critically, the privilege is essential to the Club's operation.

The facts of the instant case also differ from the recent decision in Solomon v. The Miami Woman's Club, *supra,* in which this court held that the particular state lease to a state headquarters did not contain sufficient state involvement to clothe the patently discriminatory membership policies of the local private club with the color of state law. In *Solomon* the court was faced with an arms-length lease entered into by a municipality far from the location of the local club. Here, the court is confronted with a lease to defendant of property vital to the operation of a yacht club. Thus, on the facts of this case, the Court holds that the "symbiotic relationship" between the state and the Club exists, thereby making any discriminatory action by the Club a violation of the Fourteenth Amendment. Burton v. Wilmington Parking Authority, *supra.* By virtue of the lease, the acts of the Club become those of the state and any deprivation of an individual's rights by the Club become a deprivation by the state.

*Acts of Discrimination:*

The total population of Dade County is 1,267,792 [7] with 187,500 [8] of that figure Jewish and 189,666 [9] Black. With these figures in mind, it taxes credulity that the defendant Club can state without reservation that it practices no discrimination and yet, at the same time, is unable to state whether it has ever had a Black or Jewish member in its eighty-six years of operation.

 Defendant relies on the absence of any exclusionary provision in its By-Laws to support its innocence. Certainly, the inquiry does not end there. Adams v. Miami Police Benevolent Assn., Inc., 454 F.2d 1315 (5th Cir. 1972) (whites-only clause not necessary for a finding of discrimination). Rather, the court holds that when membership in an established private club is solely by internal sponsorship and no member has ever been selected out of the large challenging group, then the membership policies of the organization are suspect. The court concludes that plaintiffs have not been afforded the same rights to membership as their White and Christian counterparts.

 It has been long established that practices and policies which are facially neutral must be subjected to scrutiny to determine whether the practices and policies are discriminatory in operation and effect. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). This principle is embodied in Title VII of the Civil Rights Act of 1964 so that practices, policies or patterns which are neutral on their face are condemned if they operate to segregate and classify on the basis of race. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L. Ed.2d 158 (1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971).

The facially neutral policy before the court is the sponsorship method of membership in the Biscayne Bay Yacht Club. While the sponsorship requirement is applicable to Black and White and Jew and Christian alike, in a club whose members from inception have been only White and Christian, the effect of the sponsorship requirement is to deny Blacks and Jews any meaningful opportunity for membership. *See, e. g.* Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); Ross v. Dyer, 312 F.2d 191 (5th Cir. 1963).

The injury suffered by plaintiffs is further strengthened by factors indigenous to this community. The court takes judicial notice of the oversupply of boats in the South Florida area in relation to the drastic shortage of dock space.[10] Indeed, the Trustees of Internal Improvement Fund, in speaking of the lease in question, recognized this as a reason· to waive its deed restrictions. This fact makes even more acute the situation of the boat owner and enthusiast who, wishing to become a member of a yacht club for purposes of dockage, is denied membership on the basis of his race or religion.

The acts of defendant, evidenced by a lack of representation of these minority groups in its long history, are social discrimination at best. It is a rejection of minorities by subtle pattern or practice, one which is difficult to prove.

Plaintiff Fincher did not appear to the court to be a boating enthusiast. Plaintiff Golden testified at length about his boating skills and unequivocally asserted that the only reason the Club denied him membership is because he is Jewish; the court does not share Mr. Golden's conclusion.

The court can feel some sympathy for the Club which has been in existence

---

7. U. S. Bureau of Census (1970).

8. *Miami Daily News*, March 13, 1972.

9. U.S. Bureau of Census (1970).

10. As of February of this year, South Florida had a shortage of 1900 boat slips. *The Miami Herald*, Feb. 15, 1973.

nearly a decade longer than the City of Miami and which utilized the waters and the submerged lands abutting this property for thirty years prior to 1962. However, under the law the court concludes that in addition to the symbiotic relationship existing between the Club and the City there is a membership policy which is discriminatory in operation and effect. Thereupon, it is

Ordered and adjudged as follows:

1. That the policy, practice and custom of defendant Biscayne Bay Yacht Club in denying membership to the members of the Jewish religion and Black race is hereby declared violative of the Fourteenth Amendment to the United States Constitution.

2. Defendant Biscayne Bay Yacht Club is hereby ordered to cease the barring of membership to applicants solely on account of their race or religious affiliations.

Nothing in this opinion is to be construed as indicating that any traditional quality of membership such as cordiality, achievement or integrity must be ignored by the Club: the Club may be discriminating in accepting members but not for unconstitutional reasons.

3. The City of Miami is dismissed as a defendant. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The court notes that the City has adopted a resolution deferring any extension of the lease with the Club pending this decision.

4. No evidence being before the court that defendant City of Miami was aware of the discrimination practiced by the Biscayne Bay Yacht Club which would require the City to terminate its lease, and assuming that defendant Biscayne Bay Yacht Club will comply with the court's Order and immediately cease its discriminatory practices, no relief is appropriate against defendant mayor or commissioners.

5. Jurisdiction of this case is retained by the court.