Harold S. GOLDEN and David Fincher, Plaintiffs-Appellees,

v.

BISCAYNE BAY YACHT CLUB et al., Defendants-Appellants.

No. 74–1349.

United States Court of Appeals, Fifth Circuit.

Sept. 26, 1975.

Rehearing En Banc Granted Nov. 19, 1975.

---

Henry Burnett, Miami, Fla., for defendants-appellants.

Maurice Rosen, Miami Beach, Fla., Warren S. Schwartz, North Miami Beach, Fla., for plaintiffs-appellees.

**1.** *§ 1981. Equal rights under the law*

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. R.S. § 1977.

**2.** *§ 1983. Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. R.S. § 1979.

**3.** SUBCHAPTER II.—PUBLIC ACCOMMODATIONS

*§ 2000a. Prohibition against discrimination or segregation in places of public accommodation—Equal access*

(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

· · · · ·

Before BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Plaintiffs, Black and Jewish applicants for membership in defendant's private Biscayne Bay Yacht Club brought this action pursuant to 42 U.S.C.A. §§ 1981,[1] 1983[2] and 2000a[3] alleging the Club discriminated on the basis of race and religion in their admission policies. The trial court[4] found a pattern of discrimination had existed and that it was conducted "under color of law" because the Club leased bay bottom land from the city of Miami, Florida regulated by ordinances that expressly prohibited discrimination for race, religion or national origin[5]

*Support by State Action*

(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof. *Private establishments*

(e) The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section. Pub.L. 88–352, Title II, § 201, July 2, 1964, 78 Stat. 243.

**4.** *Golden v. Biscayne Bay Yacht Club,* S.D.Fla., 1973, 370 F.Supp. 1038.

**5.** Miami, Fla.Code § 38–9.1 provides:

The lessee of any property of which the city is the owner shall not discriminate against or refuse or deny to any person or persons, guests or permittees, the use of the facilities leased from the city because of race, creed, religion, color or national origin. (Ord.No.7668, § 1)

Miami, Fla.Code § 38–9.2, sub. § A. II states:

There shall be no requirement that applicants for enrollment be sponsored by anyone as a condition to such applicant being processed or accepted for membership. (Ord.No. 7668, § 2; Ord.No.7682, §§ 1, 2.)

Miami, Fla.Code § 38–9.3 (Ord.No.7668, § VI, sub. § 3)

upon which to maintain its dock facilities and, such governmental participation constituted sufficient "state action" to bring the discriminatory conduct within the Fourteenth Amendment.[6] Accordingly, the trial court ordered the Club to cease the practice of denying persons membership in the Club solely on account of their race or religious affiliations. We agree.

### The History

The Club, was organized in 1887 to provide a meeting place for yachtsmen in early Miami. In 1932, the Club purchased its present club house located adjacent to Biscayne Bay. In 1962, the City of Miami asserted ownership to the bay bottom land abutting the Club's property and since that time the Club has leased from the City sufficient bay bottom land to support its docking facilities at an annual rental of $1.00.

The City acquired the bay bottom lands from the Trustees of the Internal Improvement Fund of the State of Florida under deed terms which required that the lands be used for public purposes only. In 1969 it obtained a waiver from the trustees for its lease to the Club by asserting that the docks maintained by the Club helped relieve the shortage of public dock facilities in the city. The docks are for the exclusive use of Club members and the general public is prohibited from tying up there or using the decking. But without the bay bottom land the Club could not maintain docking or mooring facilities and accordingly the City's lease of this land is essential to the Club's function, considering that a yacht club is not much of one if members and authorized guests have no means to anchor, moor or tie up their craft.

Membership in the Club is by sponsorship[7] only. The by-laws of the Club provide for invitation to membership by three sponsors (members) consisting of a proposer and two seconders who file with the Club's secretary a letter stating the candidate's qualifications for membership. After investigation by the Club a vote by secret ballot is held by the Board of Governors sitting as the Membership Committee. At least eight members are needed for a quorum and if any three members of the committee veto the candidate, the black ball is run up and no invitation is issued.[8] While the by-laws of the Club do not expressly prohibit membership by members of the Jewish faith or Black race there are no known past or present Jewish or Black members except for one honorary Black member, the Commodore of the Jamaica Yacht Club.

Both Golden and Fincher expressed interest to Club officials in obtaining applications for membership but were informed that they would have to be sponsored by a Club member to be eligible for membership. As a result of the Club's refusal to accept plaintiffs' applications they brought suit for declaratory and injunctive relief asserting that the Club's admission procedure was discriminatory on the basis of race and religion and accordingly violated the Fourteenth Amendment and the civil rights statutes.

From a finding by the trial court in favor of the plaintiffs the Club appeals asserting that, (i) the plaintiffs have no standing to challenge the Club's admission policies, (ii) the record fails to support the trial court's conclusion that the plaintiffs were deprived of their constitutional rights, (iii) that the record fails to support the trial court's conclusion that the Club's membership practices were discriminatory on the basis of race or religion, (iv) whether the Club's leasing of city owned land constituted acts under color of law sufficient to create jurisdiction within the satrapy of Title 42 U.S.C.A. § 1983.

---

**6.** The Fourteenth Amendment of the United States Constitution provides in pertinent part:

> No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.

**7.** *See* note 10, *infra*, and accompanying text.

**8.** *See Golden v. Biscayne Bay Yacht Club, City of Miami, supra*, at 1041.

## Standing

■ Fundamentally, Article III of the United States Constitution requires that the judicial power of the United States Courts shall extend only to cases or controversies arising under the Constitution, laws, or treaties of the United States. This constitutional requirement has been interpreted by the Supreme Court to mean that the plaintiff must assert that the conduct of the defendant has caused him injury in fact whether economic or otherwise. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184. In the words of Mr. Justice Marshall in *Jenkins v. McKeithen,* 1969, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404, "[t]he indispensable requirement is, of course, that the party seeking relief allege 'such personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions.'" *Id.* at 423, 89 S.Ct. at 1849. *Citing, Baker v. Carr,* 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; *Flast v. Cohen,* 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947; *Joint Anti-Fascist Refugee Committee v. McGrath,* 1951, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817. See also *Evers v. Dwyer,* 1958, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222.

■■ In the case at hand the District Court specifically found that the plaintiffs had a personal stake in the outcome of the litigation. The existing membership policies they attacked as exhibiting a pattern of discrimination formed the standards upon which the Club refused to accept plaintiffs' applications. More specifically, it is unquestionable that standing may be based upon an interest created by the Constitution or a statute.

See *Parker v. Fleming,* 1947, 329 U.S. 531, 67 S.Ct. 463, 91 L.Ed. 479; *Coleman v. Miller,* 1939, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385. Here is involved a claim of racial and religious discrimination which seems clearly to fall within the "zone of interest" of the statutory language of 42 U.S.C.A. § 1983.[9] Thus, we reject out of hand the defendant's contention that the plaintiffs possess insufficient standing to assail the membership policies of the Club.

## The Standard

■ "Two elements must be proved to recover under § 1983(i) a deprivation of a constitutional right by the defendant, and (ii) that the defendant, acted under 'color of law'." *See Smith v. Young Men's Christian Association of Montgomery,* 5 Cir., 1972, 462 F.2d 634; *accord, Adickes v. S. H. Kress & Co.,* 1970, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142. Because we find that these elements are satisfied and relief is appropriate under § 1983 we deem it unnecessary to reach the question of whether the Club's admission policies also violated § 1981 and Title II of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a.

## Acts Of Discrimination

■ The trial court found that admission policies of the Yacht Club over its long history had fostered a subtle pattern and practice of discrimination evidenced by the total lack of minority representation, save one honorary member who was a citizen of a foreign country. *See Golden v. Biscayne Bay Yacht Club, City of Miami, supra,* 370 F.Supp. at 1043. Moreover, the Court found that the sponsorship requirement, although not egregious on its face, in practicality operates to exclude Blacks and Jews from Club membership.[10] *Id., citing,*

---

9. When a statutory remedy is asserted by the plaintiff Courts consider not only the case or controversy test but also whether the interest sought to be protected by the complainant is within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. *See Tennessee Electric*

*Power Co. v. T.V.A.,* 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543.

10. In *Adams v. Miami Benevolent Association, Inc.,* 5 Cir., 1972, 454 F.2d 1315, 1318, we found that a five vote veto clause in the constitution of an organization functioned as a

*Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler,* 5 Cir., 1969, 407 F.2d 1047; *Ross v. Dyer,* 5 Cir., 1963, 312 F.2d 191.

Upon such findings of fact the trial court concluded that the "plaintiffs had not been afforded the same rights to membership as their white and Christian counterparts". *See Golden v. Biscayne Bay Yacht Club, City of Miami, supra,* 370 F.Supp. at 1043. These findings of racial and religious discrimination are supported by the record and are well above the Plimsoll line of F.R.Civ.P. 52(a). *Cook & Nichol, Inc. v. Plimsoll Club,* 5 Cir., 1971, 451 F.2d 505.

*"Under Color Of Law"—The Basis Upon Which Constitutional Restrictions Are Applied To Private Conduct Entwined With Public Activities*

■ We recognize at the outset that the Equal Protection Clause of the Fourteenth Amendment does not prohibit the "[i]ndividual invasion of individual rights." Civil Rights Cases, 1883, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835, 839. However, it does prohibit state action of every kind that operates to deny any citizen the equal protection of the laws. *Id.* When private enterprises become sufficiently entwined with Government policy or receive substantial aid and support from governmental entities they are said to be acting "under color of law" and consequently are subject to the Constitutional limitations which prohibit discriminatory conduct by the State. *See Gilmore v. City of Montgomery,* 1974, 417 U.S. 556, 565, 94 S.Ct.

2416, 41 L.Ed.2d 304; *Evans v. Newton,* 1966, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373.

This finding is not only sufficient to supply state action, it is also well armored against attack as clearly erroneous. Indeed, it draws additional validity from the type of actionable wrong here involved.

Despite its heavy overlay of law, the "state action" which supplies "color of law" ultimately turns upon resolving questions of fact, a resolution to be reviewed here under the same strictures of Fed.R.Civ.P. 52(a) applied to the trial court's finding of discrimination.

". . . the Court has never attempted to formulate 'an infallible test for determining whether the State . . . has become significantly involved in private discriminations' so as to constitute state action. *Reitman v. Mulkey,* 387 U.S., at 378, 87 S.Ct., at 1632. ' "Only by sifting facts and weighing circumstances" [on a case-by-case basis] can the "nonobvious involvement of the State in private conduct be attributed its true significance." ' *Id.,* quoting *Burton,* 365 U.S., at 722, 81 S.Ct., at 860. This is the task for the District Court . . . . "

*Gilmore v. City of Montgomery, supra,* 417 U.S. at 574, 94 S.Ct. at 2427.

Looking to the trial court's findings as the trier of the fact we find them amply supported by the evidence including uncontradicted circumstances and well grounded in the articulation of factual emphasis and awareness of significant legal precedents.[11]

"Whites only" clause even though the constitution contained no express "Whites only" language. Similarly, in this case the Judge could find the three vote veto feature of the Club's membership procedure was an effective "Whites only" provision, not to mention the sponsorship requirement which had the effect of perpetuating a membership consisting of persons with similar background, race and religious preferences.

11. The trier of fact found:

the City of Miami leases publicly owned land to the defendant Club so that the Club may

operate as a yacht club and provide dockage for its members. Here, the court is not faced with the "periodic" or incidental use of municipally owned recreational facilities as in the recent case of *Gilmore v. City of Montgomery,* 473 F.2d 832 (5th Cir. 1973). Rather, the lease under issue is on a *permanent* basis and, unlike the facilities in *Gilmore,* cannot be used by anyone other than Club members and their guests.

Neither is the court faced with the minimal degree of state involvement present in the recent Supreme Court's decision in this

With respect to racial discrimination the Supreme Court has been unwilling to condone any significant degree of state action in discriminatory conduct by private parties. *See Burton v. Wilmington Parking Authority*, 1961, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45; *accord, Reitman v. Mulkey*, 1962, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830. We have but recently taken cognizance of this in *Greco v. Orange Memorial Hospital Corp.*, 5 Cir., 1975, 513 F.2d 873 in which the Court found that there existed no

state action in a non-racial discrimination case. There the plaintiff, a physician, had been prohibited from performing elective abortions in a hospital operated by a private charitable corporation but leased from the county, received tax exemptions, and received some federal funding. In finding no state action the Court emphasized the distinction [12] between the degree of state action necessary to impose constitutional restraints in cases concerning racial discrimination[13] and the higher degree

area, *Moose Lodge No. 197 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973). In *Moose Lodge*, the issuance of a liquor license to the discriminating Club was the only nexus with the state. No special benefit by reason of the liquor license was afforded the Club by the state since, like other state furnished services such as police and fire protection, water and electricity the benefits of a liquor license were potentially available to all state citizens. Here, however, the defendant Club enjoys a select privilege not available to each citizen but one coveted by many citizens in the South Florida area. More critically, the privilege is essential to the Club's operation.

The facts of the instant case also differ from the recent decision in *Solomon v. The Miami Woman's Club* [359 F.Supp. 41 (S.D. Fla.1973)], in which this court held that the particular state lease to a state headquarters did not contain sufficient state involvement to clothe the patently discriminatory membership policies of the local private club with the color of state law. In *Solomon* the court was faced with an arms-length lease entered into by a municipality far from the location of the local club. Here, the court is confronted with a lease to defendant of property vital to the operation of a yacht club. Thus, on the facts of this case, the Court holds that the "symbiotic relationship" between the state and the Club exists, thereby making any discriminatory action by the Club a violation of the Fourteenth Amendment. *Burton v. Wilmington Parking Authority* [365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)]. By virtue of the lease, the acts of the Club become those of the state and any deprivation of an individual's rights by the Club become a deprivation by the state.

**12.** The Court stated that:

The most obvious distinguishing factor is that Orange Memorial Hospital is not accused of racial discrimination. The doctrine of state action developed primarily in the

area of racial discrimination. See State-Action Theories at 657 and footnote 10, *supra*. The concepts developed in this area, explicitly supported by constitutional and legislative mandates, were necessarily broadly drawn in order to implement Congressional intent in circumstances of positive and frequent state obfuscation and delay. The potentially explosive impact of the application of state action concepts designed to ferret out racially discriminatory policies in areas unaffected by racial considerations has led courts to define more precisely the applicability of the state action doctrine. See *James v. Pinnix*, 495 F.2d 206, 209 (5th Cir. 1974) and footnote 10, *supra*. See also *Brantley v. Union Bk. & Trust Co.*, 498 F.2d 365 (5th Cir. 1974); *Calderon v. United Furniture Co.*, 505 F.2d 950 (5th Cir. 1974); *Derrington v. Plummer*, 240 F.2d 922 (5th Cir. 1956); *Blouin v. Loyola*, 506 F.2d 20 (5th Cir. 1975); *Grafton v. Brooklyn Law School*, 478 F.2d 1137, 1142 (2nd Cir. 1973). *Compare, Simkins v. Moses H. Cone Mem. Hosp.*, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). *Greco v. Orange Memorial Hospital Corp.*, *supra*, at 879.

**13.** *See e.g., Powe v. Miles*, 2 Cir., 1968, 407 F.2d 73, 82 where Judge Friendly refused to label a private school a state actor for purposes of the Due Process Clause but indicated that charges of racial discrimination would subject the school to constitutional restraints. Likewise, in *Edwards v. Habid*, 1968, 130 U.S. App.D.C. 126, 397 F.2d 687, the Court recognized that arguably private conduct might constitute state action under the Fourteenth Amendment but not for purposes of the First Amendment guarantees of freedom of speech.

Commentators have also recognized this distinction. *See* Note, *State Action: Theories For Applying Constitutional Restrictions To Private Activity*, 74 Colum.L.Rev. 656, 657 (1974); Comment, *State Action and The Burger Court*, 60 Va.L.Rev. 840 (1974). For more general discussions of these concepts see Lewis, *The Meaning of State Action*, 60 Colum.L.Rev.

of state involvement which is necessary for private conduct to be subjected to Fourteenth Amendment sanctions when other types of constitutional violations have occurred.[14] The Courts' willingness to find state action more readily in racial discrimination cases is not hard to explain. After all, such discrimination was the very condition that precipitated the enactment of the Fourteenth Amendment.[15]

In cases involving racial discrimination courts have found state action when the nexus between the state and the private activity is far more attenuated than in *Greco*.[16]

For example in *Norwood v. Harrison, supra,* the Supreme Court found state action when the Government merely provided free textbooks to students in a private segregated school and prohibited even this slight degree of state assistance unless the schools demonstrated that racial discrimination did not exist.[17]

■ We believe, in this context,[18] religious discrimination against the Jewish applicant carries the same stigma of inferiority and badge of opprobrium that is characteristic of racial discrimination.[19] Accordingly, we apply the well developed standards utilized in the racial discrimination setting to both litigants, for the gravity of harm is exactly the same as to both plaintiffs and there exists no rational basis for distinguishing between them by allowing relief as to one while denying it to the other.

*The Facts Fit*

We do not deal here with a "traditional state monopoly" (such as electricity, water, or fire and police protection) or any "generalized governmental service." See, *Gilmore v. City of Montgomery,* supra. The city's involvement is both specialized and unique.

■ It is apparent from the relationship between the City of Miami and the Club that without the City's lease of the bed of the bay the Club could not exist. The very nature of the Club required that there exist dock and mooring facilities for the vessels of its members. No showing was made that the City was compelled to grant the lease. Indeed, the city relied on the Club's operation of dock facilities on the leasehold to supply

1083, 1093 (1960); Karst & Horowitz, *Reitman v. Mulkey; A Telophase of Substantive Equal Protection,* 1967, Sup.Ct.Rev. 39, 55–58 (1967); Williams, *The Twilight of State Action,* 41 Texas L.Rev. 347, 378 (1963).

14. Lack of state action has been more readily determined by the Courts in areas not involving racial discrimination. *See, e.g. Jackson v. Metropolitan Edison Co.,* 1974, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (no state action found to exist in a suit by a customer of a utility company who asserted the company unconstitutionally terminated his service); *Lloyd Corp. v. Tanner,* 1972, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (freedom of speech); *Male v. Crossroads Associates,* 2 Cir., 1972, 469 F.2d 616; *McQueen v. Drucker,* 1 Cir., 1971, 438 F.2d 781 (non-racial discrimination cases). *See also* Burke and Reber, *State Action, Congressional Power and Creditors' Rights: An Essay On The Fourteenth Amendment,* 47 S.Cal.L.Rev. 1 (1973).

15. *See, e.g., Ex Parte Virginia,* 1880, 100 U.S. 339, 344–45, 25 L.Ed. 676; *Slaughter-House Cases,* 1873, 83 U.S. (16 Wall.) 36, 71, 21 L.Ed. 394. *See generally* Note, *State Action: Theories For Applying Constitutional Restrictions To Private Activity, supra,* at 657–58; Comment, *State Action And The Burger Court, supra,* at 846.

16. *See e.g., Pitts v. Department of Revenue,* E.D.Wis., 1971, 333 F.Supp. 662, where, in a racial discrimination case the Court found state action in merely granting a tax exemption.

17. *Compare Board of Education v. Allen,* 1968, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060, where the Court held that the loaning of textbooks to private school children did not violate the Establishment Clause of the First Amendment.

18. The infringement upon religious freedom in this case is invidious religious discrimination which is violative of the Equal Protection Clause of the Fourteenth Amendment, as well as the establishment clause and free exercise clause of the First Amendment.

19. *See O'Malley v. Brierley,* 3 Cir., 1973, 477 F.2d 785, 795–96; *cf., Developments in the Law—Equal Protection,* 82 Harv.L.Rev. 1065, 1127 (1969).

the degree of "public use" which the state's grant to the city required. So much more is involved than simple ownership and lease. The effectuation of the lease required the mutual cooperation of the city and the Club. Aside from the fact that the lease was essential to the Club's function, and the Club's function was essential to this "public use" validity of the lease, the City provided substantial financial aid to the Club by making the bay bottom land available for the token rental of $1.00 per year.[20]

So too this Court has held that the leasing of government owned property to private entities which discriminate on the basis of race, is a sufficient nexus between private and public conduct to establish "state action".[21] *See Wimbish*

*v. Pinellas County, Florida*, 5 Cir., 1965, 342 F.2d 804. This position was emphatically endorsed by Justice White concurring in *Gilmore*.[22]

The very same activity—exclusive use of public property by private, racially discriminatory entities—which is occurring here was condemned by the Supreme Court in *Gilmore*. Moreover, this Court's recent decision in *Goodloe v. Davis*, 5 Cir., 514 F.2d 1274 (1975) established that even nonexclusive use by a private segregated summer baseball league along with some financial support from the city, was a sufficient nexus between Government and private actions to form the basis of a finding of "state action", where the effect was to interfere with the District Court's desegregation order.

**20.** On numerous occasions the Supreme Court has expressed its unwillingness to sanction government monetary aid to private entities which discriminate on the basis of race. *See, e.g., Cooper v. Aaron*, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 where the Court stated that "[s]tate support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny . . . equal protection of the laws." *See also Norwood v. Harrison, supra*, (state textbook loan to private schools with discriminatory admissions policies prohibited); *accord, Coit v. Green*, 1971, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550; *Griffin v. County School Board of Prince Edward County*, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; *Burton v. Wilmington Parking Authority, supra. See also*, note 21, *infra* and accompanying text.

**21.** Similarly, our Court has refused to condone the sale of public property to private all-white acadamies which discriminate racially. *See Wright v. Baker County Board of Education*, 5 Cir., 1974, 501 F.2d 131 (Court rescinded the sale by the School Board of an elementary school to white parents for the establishment of a segregated school); *United States v. State of Mississippi*, 5 Cir., 1974, 499 F.2d 425 (en banc) (sublease of public school facility to private segregated school set aside); *McNeal v. Tate County School District*, 5 Cir., 1971, 460 F.2d 568 (Court enjoined discriminatory use of old dilapidated school facility sold to all-white school); *Wright v. Brighton*, 5 Cir., 1971, 441 F.2d 447, *cert. denied*, 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (Court enjoined sale or

lease of public junior high school to segregated private school).

**22.** Justice White stated that:

It may be useful also to emphasize that there is very plainly state action of some sort involved in the leasing, rental, or extending the use of scarce city-owned recreation facilities to private schools or other private groups. The facilities belong to the city, an arm of the State; the decision to lease or otherwise permit the use of the facilities is deliberately made by the city; and it is fair to assume that those who enter into these transactions on behalf of the city know the nature of the use and the character of the group to whom use is being extended. For Fourteenth Amendment purposes, the question is not whether there is state action, but whether the conceded action by the city, and hence by the State, is such that the State must be deemed to have denied the equal protection of the laws. In other words, by permitting a segregated school or group to use city-owned facilities, has the State furnished such aid to the group's segregated policies or become so involved in them that the State itself may fairly be said to have denied equal protection? Under *Burton v. Wilmington Parking Authority*, 365 U.S. 715 [81 S.Ct. 856, 6 L.Ed.2d 45] (1961), it is perfectly clear that to violate the Equal Protection Clause the State itself need not make, advise, or authorize the private decision to discriminate that involves the State in the practice of segregation or would appear to do so in the minds of ordinary citizens.

417 U.S. 556, 582, 94 S.Ct. 2429.

*Moose Lodge No. 107 v. Irvis,* 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, does not stand in the way.[23] In *Moose Lodge* petitioners contended that the local Moose Lodge discriminated on the basis of race and that such private conduct was under color of state law because the state issued the lodge a liquor license. However, the Court held that this licensing alone was an insufficient nexus to establish "state action".

In contrast to *Moose Lodge* the *City of Miami–Biscayne Bay Yacht Club* is more akin to the lessor-lessee relationship found to constitute state action by the Supreme Court in *Burton v. Wilmington Parking Authority, supra.* Indeed, the city fostered the Club's continued existence and prosperity by providing a lease essential to the Club's operation and by charging a token fee for the privilege of excluding members of the public from the beneficial use of public property. Surely, without the city's participation the Club could not have existed as a yacht club. It could, of course, become a yacht club in name, landlocked and separated from mooring facilities. But it could not exist as one in fact. Accordingly the city, as the arm of the state, was significantly involved in the private discriminatory activity.[24] Correspondingly, the Yacht Club served the city by maintaining dockage at its private expense which relieved the pressures on the city's crowded dock facilities.

*The Judicial Tightrope—Equal Protection versus Freedom Of Association*

 We are cognizant that Courts should minimize the extent to which they infringe upon the individual's First Amendment right to freedom of association. Mr. Justice Douglas, dissenting in

*Moose Lodge,* expressed this well in saying that "[t]he associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established." 407 U.S. at 179–80, 92 S.Ct. at 1974. Nevertheless, that private exercise of freedom of association must function without significant state support and involvement. *See Gilmore v. City of Montgomery, supra,* 417 U.S. at 575, 94 S.Ct. at 2427. "Invidious discrimination takes its own toll on the freedom to associate, and it is not subject to affirmative constitutional protection when it involves state action". *Id.* *See also Norwood v. Harrison, supra,* 413 U.S. at p. 470, 93 S.Ct. 2804.

Affirmed.

COLEMAN, Circuit Judge (dissenting).

Even the half-alert will quickly grasp what this decision means. So far as I know, or can find out, this is the first time in the history of American jurisprudence that a federal court has assumed jurisdiction over the membership policies of a genuinely private club. Since the City of Miami has absolutely nothing to do with the support, the internal operation, or the membership policies of this private yacht club and since the club performs no public function whatever, this decision means that hereafter in the Fifth Circuit no private club, private individual, or collection of private individuals may lease public property for private use and be able thereafter to remain private. *If there is a lease there is significant state involvement.* The far reaching consequences of this unprecedented action will be discussed in a moment.

Since I remain entirely unconvinced that the Constitution imposes such a re-

---

**23.** While some commentators read *Moose Lodge* to indicate some reluctance by the Supreme Court to find "state action" in racially discriminatory private club activity, *see,* Note, *State Action: Theories For Applying Constitutional Restrictions To Private Activity, supra,* at 688–89; Comment, *State Action and The Burger Court, supra,* at 849–50. *Gilmore* indicates that the Court remains unwilling to con-

done any *significant* involvement by governmental entities in racially discriminatory activity.

**24.** The Supreme Court in *Gilmore v. City of Montgomery, supra,* at 572–74, 94 S.Ct. 2416, distinguished *Moose Lodge No. 107 v. Irvis, supra,* in a similar way.

strictive covenant upon purely private activities, and since I am more than convinced that the majority opinion conflicts with a prior decision of this Court rendered less than ninety days ago (*Greco v. Orange Memorial Hospital*), I am compelled, however regretfully, to dissent.

All we have in this case is that the City of Miami leased the use of the waterbottoms to a lessee which, beyond dispute, has been a private club for 88 years. As already pointed out, the City exercises no control over the club, it does not participate in its operations in any form, it has nothing to do with club membership policies. The club performs no function ordinarily attributable to the public domain. *The lease is the sole nexus between the club and the city.*

The majority opinion attaches much significance to the fact that without the lease there would be no yacht club. It is equally true, however, that if the Moose Lodge had been without a state liquor license it could not have sold drinks to its members and their guests, *Moose Lodge No. 107 v. Irvis,* 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627. The Supreme Court held that the issuance of the liquor license did not supply the necessary state action. The significant point was that the state license required the Lodge to abide by its racially discriminatory constitution and by-laws. That *was* state action, but there is nothing of that kind in this case.

I think the true rule for situations of this kind was recently enunciated by the Second Circuit in *New York Jaycees, Inc. v. United States Jaycees,* 512 F.2d 856 (1975), a case which involved grants of federal funds to an organization which restricted its membership:

> Plaintiff concedes, as it must, that private action is immune from the restrictions of the Fifth and Fourteenth Amendments. See, e. g., *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *The Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). However, plaintiff claims

that National's receipt of federal funds and tax exemptions, as well as its performance of civic functions, constitutes state action sufficient to subject it to scrutiny under the constitutional standard. We disagree.

> The mere existence of government ties to a private organization is not sufficient to support a finding of state action. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968). As this court stated in *Powe,* "[t]he state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." 407 F.2d at 81. The Supreme Court has recently reaffirmed the principle that the determination of state action must be based on a particularized inquiry focusing on whether there is "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Company,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). In this case the requisite connection between government and the offending activity has not been shown. Plaintiff does not charge discrimination in the operation of federally funded Jaycee programs; indeed such a claim could not be supported since not only do women participate both in the selection of local recipients for funding and in the implementation of programs, but also the benefits of all federally funded Jaycee programs are distributed without regard to sex or other impermissibly discriminatory criteria. Plaintiff's constitutional challenge is addressed solely to the internal membership, policies of the Jaycees; yet plaintiff has made no showing that the government is substantially, or even minimally, involved in the adoption or enforcement of these policies.

I respectfully submit that the majority in this case signally fails in its efforts to distinguish *Greco v. Orange Memorial Hospital*, 5 Cir., 1975, 513 F.2d 873.

In *Greco* the defendant was a private hospital, *patronized by the public,* which leased not only the land but the building from the county. Neither the state nor the county had anything to do with its actual operation. The hospital refused to permit elective abortions. This Court held that neither federal financial assistance nor the lease of the building and grounds supplied the necessary nexus for a finding of state involvement. It was declared that the federal courts had no jurisdiction.

A hospital to which the general public has access is a far cry from a private club, which owns its facilities and performs no public function. But the present majority opinion says that state action is not in what the state does but is to be determined by who it does it to, that is, there is one law for a racial or religious complaint and yet another law for the denial of an abortion which the state is constitutionally forbidden to deny. I simply cannot grasp the logic for this kind of judicial picking and choosing.

To pursue the factual similarities, and dissimilarities, between *Greco* and the instant case, the following comparison is, I think, of considerable significance:

| The Yacht Club Case | The Greco Case |
| --- | --- |
| **I** | **I** |
| The Club owns the building and the land upon which it is situated and has since 1932. | The County owns the building and the land upon which the hospital is situated and has since its inception. |
| **II** | **II** |
| The Club was built and operated with private funds and is a private organization. | The hospital was constructed with $1,762,000 county funds and $1,250,000 Hill-Burton funds and is open to the public. |
| **III** | **III** |
| Years subsequent to the construction of docks into and over Biscayne Bay by the Club, the City laid claim to the bay bottom land in 1962 over which such docks extended and subsequent thereto the Club has leased such bay bottom land beneath such docks for $1.00 per year. | The hospital leases the land and the building from the county for $1.00 per year and has since its inception. |
| **IV** | **IV** |
| Under lease the Club assumed no no obligation to the City. | Under lease, the hospital agreed to provide certain services and operate in a prescribed manner. |
| **V** | **V** |
| The City has never directly or indirectly participated in the disputed alleged club policy. | The County neither directly nor indirectly participated in the disputed hospital policy. |

From this comparison it can readily be seen that the relationship existing between the County and Orange Memorial Hospital was indeed far closer, far more significant, of longer standing and far more controlling than the relationship between the yacht club and the City of Miami. Despite such substantial involvement and interrelationship, the *Greco* opinion determined that the necessary "symbiotic relationship" of state action was lacking and the necessary nexus between the state's involvement and the conduct or policy complained of was absent.

The inescapable end result of the majority opinion is that a private club which leases any part of its premises from a public owner thereby loses its private status and its membership policies will be grist for the courts. As if we did not already have more to do than we can possibly perform, judges now become ex-officio managers of the membership policies of all such private clubs. One wonders what is to become of the heretofore loudly trumpeted constitutionally guaranteed rights of privacy and freedom of association.

I now take a look at other practical effects of this decision. All around the Gulf of Mexico, the waterbottoms are publicly owned. They are trust property and cannot be sold. They can only be leased for a term of years. Under this decision we say farewell to private yacht clubs, private hunting clubs, or any other private club operating on such property and leased exclusively to a named private lessee.

But the matter does not stop there. In Mississippi, for example, there are hundreds of thousands of acres of Sixteenth Section School land (Northwest Ordinance of 1787). The State cannot sell the land. It can only lease it for a term of years. It is used for private homes, for farming, and for numerous other private purposes involving no public function. Before today it had never occurred to me that because of the leases the many private activities and occupations pursued on these lands involve significant state action.

I would hold that no significant state action is involved in this private yacht club case. I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.