Harold S. GOLDEN and David Fincher,
Plaintiffs-Appellees,

v.

BISCAYNE BAY YACHT CLUB et al.,
Defendants-Appellants.

No. 74–1349.

United States Court of Appeals,
Fifth Circuit.

April 15, 1976.

Brown, Chief Judge, dissented and filed an opinion in which Wisdom, Goldberg, Godbold and Clark, Circuit Judges, concurred.

Henry Burnett, Miami, Fla., for defendants-appellants.

Maurice Rosen, North Miami Beach, Fla., Warren S. Schwartz, Miami, Fla., for plaintiffs-appellees.

Before BROWN, Chief Judge, WISDOM, GEWIN, BELL,\* THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE and TJOFLAT, Circuit Judges.\*\*

COLEMAN, Circuit Judge.

A city leased to a private yacht club the bay bottom land underlying club-constructed and club-maintained dock facilities connected to the club lands on shore. The club thus had exclusive use and control of the docks, a situation which had existed long before the lease was executed. The District Court held that the existence of the lease, and that alone, amounted to significant state involvement with the membership policies of the club, 42 U.S.C., § 1983, *Golden v. Biscayne Bay Yacht Club*, 370 F.Supp. 1038 (S.D.Fla., 1973). The lease and the use of the docks were left undisturbed. Instead, it was ordered and adjudged:

"1. That the policy, practice and custom of defendant Biscayne Bay Yacht Club in denying membership to the members of the Jewish religion and Black race is hereby declared violative of the Fourteenth Amendment to the United States Constitution.

"2. Defendant Biscayne Bay Yacht Club is hereby ordered to cease the barring of membership to applicants solely on account of their race and religious affiliations. 370 F.Supp., at 1044.

"3. Jurisdiction is retained for the enforcement of the decree."

The judgment of the District Court was affirmed by a panel of this Court, one Judge dissenting, *Golden v. Biscayne Bay Yacht Club*, 5 Cir., 1975, 521 F.2d 344.[1]

So far as can be determined from a diligent search of the precedents, this is the first time in the history of Fourteenth Amendment jurisprudence that a federal district court has undertaken the supervision of membership policies in a genuinely private club. A majority of the Judges of this Court in active service, one Judge not participating, granted rehearing *en banc*.

Upon a thorough sifting of the facts and circumstances of this case, we are of the opinion that the bay bottom lease did not supply the requisite Fourteenth Amendment significant state involvement in the membership policies of the private club. Accordingly, we reverse the judgment of the District Court and remand the case with directions to dismiss the complaint.

*Prologue*

There are undisputed considerations which, at the outset, ought to be taken into account.

The lessor was the City of Miami, organized in 1896. The lessee was the Biscayne Bay Yacht Club, organized in 1887.

The case does not come here as a class action.

The club was genuinely private. The District Court so found, and additionally held that "it certainly was not formed as a subterfuge to evade the civil rights laws", 370 F.Supp., at 1041. It performed no public function; it did nothing that had ever been a public function. It neither receives nor spends funds allocated from any public source. The city

---

\* Bell, Circuit Judge, heard oral argument and participated in conference en banc. He concurred in this opinion (the comments on the dissenting opinion excepted) on January 29, 1976, prior to his resignation on March 1, 1976.

\*\* Dyer, Circuit Judge, did not participate in the consideration or disposition of this appeal.

1. The Panel majority held, 521 F.2d at 348, that "Here is involved a claim of racial and religious discrimination which seems clearly to fall within the 'zone of interest' of the statutory language of 42 U.S.C.A., § 1983". There was no cross appeal from the failure of the District Court to find or assert jurisdiction under any other Civil Rights statutes. The District Court decided only the § 1983 issue. We do the same.

had no part, and took not part, in the operations or internal policies of the club. As to membership policies, the District Court found that there was no evidence that the city had been aware of any discrimination practiced by the club which would require termination of the lease, 370 F.Supp., at 1044.

The Panel majority opinion held that "the City provided substantial financial aid to the Club by making the bay bottom land available for the token rental of $1.00 per year", 521 F.2d 352. If the District Court considered this point it failed to mention it and made no finding that the city contributed in any way, substantial or otherwise, to the financial support of the club.

To be more specific, the District Court noted:

"Except for the existence of the lease, the City of Miami has never participated in or been involved in the operation of the Club."

370 F.Supp., at 1040.

A fortiori, the issue on this appeal is whether the lease, the sole nexus between city and club, supplied the significant state involvement required to activate 42 U.S.C., § 1983.[2]

### The Law

This is not the kind of case in which we are left to flounder blindly in search of the applicable law. On several occasions in the recent past the Supreme Court, as more specifically discussed hereinafter, has carefully surveyed the field and articulated principles governing significant state involvement in private activities.

The purpose of the Amendment and of the statute, 42 U.S.C. § 1983, is to preserve and enforce, as against state action, those rights, privileges, and immunities "secured by the Constitution and laws". In the absence of impermissible state involvement, it would hardly be argued that membership in a private club, at the option of the applicant, is a right or privilege enforceable in the federal courts or anywhere else. Unless and until state action, or action taken under color of state law, significantly enters the lists on the side of impermissibly discriminatory results, the internal membership policies of a genuinely private club furnish no grist for the federal judicial mill. See, e.g., The Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Evans v. Abney, 1970, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634; Moose Lodge No. 107 v. Irvis, 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627.

We begin our analysis with a thoroughgoing recognition of the teachings of a pioneer case in the field now specifically under consideration, Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45.

Burton was a racial discrimination case. The object of the complaint was a restaurant, leased from a state agency, housed in a building owned and operated by that agency. The lease was needed to produce revenue to finance the construction of the building. To a certain extent the restaurant enjoyed a portion of the tax exempt status of its state owned landlord. The state agency furnished heat and repairs; it received rent in the amount of $28,700 per annum.

The state court held that the restaurant operated in "a purely private capacity".

The Supreme Court reversed, noting that the land and building were publicly owned, that the building was dedicated to public uses, the leased areas were not

---

2. "§ 1983. Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

surplus state property, they constituted a physical and financial integral, and they were an indispensable part of the State's plan to operate the project as a self-sustaining unit. The operation conferred mutual benefits upon lessor and lessee. Of no small moment was the fact that "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency".

The conclusion was that:

"The State has so far insinuated itself into a position for interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."

365 U.S., at 725, 81 S.Ct., at 862, 6 L.Ed.2d, at 52.

The standard first announced in *Burton,* "that the State had so far insinuated itself into a position of interdependence with the restaurant that it was a joint participant in the enterprise", was reiterated in *Jackson v. Metropolitan Edison Company,* 1974, 419 U.S. 345, 357, 95 S.Ct. 449, 457, 42 L.Ed.2d 477, 487. *Jackson* was not a racial discrimination case but the Court noted:

"Petitioner advances a series of contentions which, in her view, lead to the conclusion that this case should fall on the *Burton* side of the line drawn in the *Civil Rights Cases, supra,* rather than on the *Moose Lodge* side of that line. We find none of them persuasive."

419 U.S., at 351, 95 S.Ct., at 454, 42 L.Ed.2d, at 484.

Burton and *Moose Lodge* were racial discrimination cases. The Supreme Court accepted them as lines of demarcation in *Jackson's* case, although it did not involve racial discrimination. The standard, state insinuation into a position of interdependence so as to become a joint participant in the challenged private ac-

tivity, has been used by the Supreme Court in both racial and non-racial cases. The basic principle remains the same in either type case: the facts either establish or do not establish significant state involvement in the private activity.

In a § 1983 case involving alleged racial discrimination by a private club, the charge we have before us here, the Supreme Court said:

"[W]here the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations'."

*Moose Lodge, supra,* 407 U.S., at 173, 92 S.Ct., at 1971, 32 L.Ed.2d, at 637.

The Court extensively discussed *Burton, supra,* with obvious approval, and found "nothing approaching the symbiotic relationship between lessor and lessee that was present in *Burton*", at 175, 92 S.Ct., at 1972, 32 L.Ed.2d at 638.

The Court further informed us that the issue of significant state involvement in private activities may be resolved only "by sifting facts and weighing circumstances", at p. 172, 92 S.Ct., at 1971, 32 L.Ed.2d, at 637. *Burton,* of course, told us in 1962 that the Amendment's embrace "can be determined only in the framework of the peculiar facts or circumstances present", that is, on a case by case basis.

In any event, the Supreme Court told us in *Jackson, supra,* 419 U.S., at 351, 95 S.Ct., at 453, 42 L.Ed.2d, at 484, citing *Moose Lodge,* 407 U.S., at 176, 92 S.Ct., at 1973, 32 L.Ed.2d at 639:

"[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as *that of the State itself.*" (Emphasis added).

In this connection, we recall *Greco v. Orange Memorial Hospital,* 5 Cir., 1975, 513 F.2d 873, which involved a tax exempt hospital mandatorily open to the general public, presumably burdened with all the nondiscriminatory duties owed all persons within the public do-

main. Racial discrimination was not at issue, but significant state involvement in the operation was. The county owned the hospital and the land on which it stood, costing $3,682,000 in public funds. It was leased from the county under what amounted to a perpetual lease for $1.00. In at least eight respects the county retained control over the hospital. However, the county participated neither directly nor indirectly in the formulation of the disputed hospital policy (denial of elective abortions). 513 F.2d at 881.

In the light of those facts, this Court concluded:

> "In summary, we find that Orange County is not sufficiently connected with the Orange Memorial Hospital Corporation's activities to imbue those actions with the attributes of the state."

513 F.2d, at 882.

With the Chief Justice and Mr. Justice White dissenting because of conflicts within the Circuits, the Supreme Court denied certiorari, *Greco v. Orange Memorial Hospital* (1975, 44 U.S.L.W. 3328) 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376.

### Facts

The law is plain.

We now proceed to the sifting of the facts and circumstances. The basic facts are not in dispute—only the proper legal conclusion to be drawn from those facts is at issue. The clearly erroneous rule does not come into play.

As already noted, the Biscayne Bay Yacht Club is a genuinely private club. So far as the record shows, it has never had any black or Jewish members. It was not founded for the purpose of evading any Civil Rights laws. Its existence antedates that of the city from which it holds a bay bottom lease.

The club does not now perform, and has never performed, any public function. It receives no support from the public treasury and has never received any. It does have the exclusive use of dock facilities of its own construction and maintenance, for which it pays the City of Miami one dollar for a lease on the waterbottoms over which those facilities are constructed. There is no finding in this record that the lease fee is grossly inadequate, amounts to subsidy for the club, or represents a substantial financial contribution to the operation of the club.

The club does not monopolize access to or the use of the public waters of Biscayne Bay. The District Court did not suggest, nor is there any substantial reason to believe, that the club significantly interferes with such use or access. Indeed, public dock facilities are located near those of the club. The District Court made no finding, and we do not know, how many private docks extend into the Biscayne Bay waterfront, by the hundreds or otherwise, nor do we know how many are built over bay bottoms leased from the city, or for what consideration paid the city.

We do know, for the District Court so found, and it is undisputed, that "except for the existence of the lease, the City of Miami has never participated in or been involved in the operation of the Club", 370 F.Supp., at 1040. This means, of course, that the city played no part whatever in the membership policies of the club. The District Court found that there was no evidence before the Court that the City of Miami was "aware of the discrimination practiced by the Biscayne Bay Yacht Club which would require the City to terminate its lease", 370 F.Supp., at 1044.

There have never been any membership requirements or restrictions related to or predicated upon either race or religion but membership can be obtained only by sponsorship of three club members and by secret ballot of the club. The result of this internal membership policy has been, and is, that the club has no black or Jewish members.

On these facts, the Court held that the lease to the bay bottoms underlying the dock facilities was "essential to the club's operation", that it was "vital to the operation of a yacht club", and that

the " 'symbiotic relationship' between the state and the Club exists, thereby making any discriminatory action by the Club a violation of the Fourteenth Amendment (citing *Burton*)", 370 F.Supp., at 1042.

### The Lease History

The first yacht race on Biscayne Bay, with fifteen boats participating, took place on Washington's birthday, 1887, about nine years before the City of Miami became an organized municipality.

Shortly afterwards the Biscayne Bay Yacht Club was organized at the Peacock Inn. The club was incorporated under the laws of Florida in 1893 and subsequently reincorporated as a non-profit corporation in 1969.

The club room remained at Commodore Monroe's boathouse until 1909. It then moved into its own building, a two story structure, built on piling *at the end of the dock,* but still on the Commodore's property. Later, a new station on the bayfront a short distance north of Flagler Street was built over the water, with a long dock in front. This had to be abandoned in 1925 because of the construction of the Bayfront Park. Another building was leased but the club soon fell on hard times, caused by the hurricane of September, 1926, by the collapse of the Florida boom, and by the failure of the Bank of Bay Biscayne. In 1932, however, the club obtained its present property, located at 2540 South Bayshore Drive, Coconut Grove.

Thereafter, for thirty years, 1932–1962, things sailed along with clear skies, fair winds, glassy seas, and even keels. In 1962 the City of Miami *asserted* title to the bay bottoms under the dock facilities of the Biscayne Bay Yacht Club. This was thirteen years after 1949, when, for ten dollars, the Trustees of the Florida Internal Improvement Fund had conveyed portions, if not all, of the bay bottoms to the city. The 1962 assertion of title was handled by the club leasing the bay bottoms which supported its dock facilities for a dollar a year. The record suggests that this may have been

done under protest but the District Court makes no finding as to whether the City of Miami actually had valid title to the bay bottoms or what the riparian rights of the club may have been. We are left with Footnote 2, 370 F.Supp. 1040, that "Neither side has raised the issue of whether riparian rights were vested in the Club prior to 1962". Nothing is said about riparian rights since 1962. In any case, the lease is there, the club is obviously accepting its benefits, whatever they may be, so we decide the case in the light of its existence.

It is not to be overlooked, however, that the 1962 lease wrought no change in a situation which had uninterruptedly been in effect for thirty years. The club had been there all the time. The docks had been there all the time. After the execution of the lease the club ran exactly as before. Indeed, there is nothing to indicate that anybody intended the lease to cause any change in those operations. The fact is that the City of Miami laid claim to title to the bay bottoms underlying the docks. The question was not litigated but was resolved by the execution of the lease.

Since the lease was the sole nexus between the city and the club, and since the District Court found that the lease significantly involved the city in the internal operations of the club, we do not know why the Court did not cancel the offending appendage and simply enjoin the use of the docks. In cases involving the attempted conversion of property formerly public into impermissible private uses this Court has cancelled leases and set aside sales. See, e. g., *Wright v. City of Brighton,* 5 Cir., 1971, 441 F.2d 447 (sale rescinded) and *United States v. State of Mississippi,* 5 Cir., 1974, 499 F.2d 425 (lease cancelled). This would have left this private club free to use its own club house, situated on its private property, as it saw fit, which, under the Constitution of the United States it clearly would have had the right to do. This, of course, would have forestalled federal court intervention into the internal affairs of a genuinely private club

and it would have forestalled even the slightest claim of plaintiff-appellees to membership in the club.

Perhaps the outcome was influenced by a strong practical consideration. If the docks had been cut loose from the club they, for all practical purposes, would have been useless. No one could have obtained access to them or egress from them across the private property of the club. The ability to drive up in a boat or leave in a boat would have been of little value if one were nevertheless marooned at that point from dry land.

### Our Decision as to Significant State Involvement

█ On the law as above discussed, and on the facts as above recited, we have the same opinion of this case that the Supreme Court had in *Moose Lodge, supra*; the facts and circumstances fall far short of the symbiotic relationship found in *Burton, supra*. As a matter of law and fact, they fall short of establishing that the City of Miami has so far insinuated itself into a position of interdependence with the club that it must be recognized as a joint participant in the internal membership policies of the club. The City of Miami has not significantly involved itself in those membership policies. The lease does not provide a sufficiently close nexus between the city and the club so that the action of the club may be fairly treated as that of the city.

Both the District Court and our Panel which originally heard this appeal obviously applied the "but for" rule to this situation. The Panel said "without the city's lease of the bed of the bay the club could not exist". Leaving aside the fact that this private club had been in operation for many years, with docks occupying the bay bottoms, before the city laid claim to title, we think the Supreme Court attributed little significance to the

"but for" situation appearing in *Moose Lodge*. But for the liquor license the private club could not have sold drinks. It requires no huge store of imagination to know in 1976 that without the ability to supply drinks private clubs would, at best, have a hard time existing. In any event, the "but for" element did not rear its head in the decision in *Burton*, which did involve a lease to public property, without which the restaurant could not have existed. If the "but for" approach were enough, the Supreme Court could have swiftly disposed of *Burton* with one of the shortest per curiams on record. Neither is it to be overlooked that *Burton* was concerned with a place offering public accommodation, not a private club. See, *Moose Lodge, supra*, which was concerned with a private club. See, also, case note on the Panel decision in this case, 54 Texas Law Review 642 (1976).[3]

### Some Incidental Issues

In June and July of 1968 the City of Miami enacted lengthy, extensive ordinances prohibiting any form of racial or religious discrimination by lessees of city owned land. The ordinances were not only prohibitory but prescribed affirmative action by the lessees, such as opening up membership rolls, prohibiting selection of members by secret ballot, directing that applicants for membership should not be required to have sponsors, and the like.

The District Court noted the existence of these ordinances, 370 F.Supp. 1040–1041. However, the case was decided solely on Fourteenth Amendment grounds. There is no cross assignment of error by the appellees, raising any issues of pendent jurisdiction relief. We consider, therefore, that we have only a § 1983 case.

The District Court did not consider or decide whether the Miami ordinances ap-

---

**3.** The author of the Texas Law Review article wrote: "The cumulation of the factors relevant to state action analysis demonstrates that the state's involvement with the Biscayne Bay Yacht Club is insufficient to classify the club's exclusion of plaintiffs as state action. \* \* \* Both policy and precedent require that the Fifth Circuit, considering the case en banc, reverse the panel's decision". [At 652].

plied to bay bottom lessees. If the ordinances do apply, it was not decided whether they provided appellees with an adequate remedy at law (forestalling injunctive procedures). Nothing was said about a failure to enforce the ordinances as possibly supplying grounds for Fourteenth Amendment relief. In short, the opinion and judgment below did not rely on the ordinances. We leave them where the District Court left them.

One final word. This is not a class action suit. There were two plaintiffs. Mr. Fincher is black. Mr. Golden is Jewish. About these plaintiffs the Court made the following cryptic comment:

> "Plaintiff Fincher did not appear to the court to be a boating enthusiast. Plaintiff Golden testified at length about his boating skills and unequivocally asserted that the only reason the Club denied him membership is because he is Jewish; the court does not share Mr. Golden's conclusion."

370 F.Supp., at 1043.

From this it could be inferred that Mr. Fincher was not a very appropriate candidate for membership in a yacht club and that Mr. Golden was not denied membership on account of his religion. The Court nowhere specifically found as a fact that either was rejected on account of race or religion. It did say that their inability to get a recommendation amounted to a rejection and thus gave them standing to challenge the membership policies of the club. It did not *expressly* find as a fact that their inability to get a recommendation was caused by reasons of race or religion. That the Court thought so reasonably appears, however, from the opinion, considered as a whole. It may be that the standing of Fincher and Golden was too thin. See, e. g., *Rizzo v. Goode* [1976, 44 U.S.L.W. 4095] 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561. We have concluded, however, not to allow this point to decide the disposition of the appeal.

The dissenting opinion emphasizes that the Miami ordinances "became a part of this and other similar leases by the City of public property". The ordinances repeatedly refer to "*facilities*", and nothing else. Query: Is a bay bottom a *facility*? We indicate no opinion on the subject because, in the posture of this appeal, we regard the applicability of the ordinances as not before us for review and thus immaterial.

In like manner, we attribute no significance to Golden's *failure*, all the way through the Florida Court of Appeals, to secure an adjudication that the ordinances do apply to bay bottom land. Possibly, he chose the wrong procedure or sought the wrong relief. As to this the record is silent and such blind spots are not to be illuminated by appellate guess work.

Our decision is founded on the case made by the parties and decided by the District Court. That Court found as a fact that the existence of the lease was the sole nexus between the City of Miami and the Biscayne Bay Yacht Club. The Court further held that this, alone, amounted to significant state involvement with the club and its membership policies.

For all the reasons hereinabove articulated, we must disagree.

The judgment of the District Court is reversed and the cause remanded with directions to dismiss the complaint.

REVERSED and REMANDED with Directions.

JOHN R. BROWN, Chief Judge, with whom WISDOM, GOLDBERG, GODBOLD and CLARK, Circuit Judges, join (dissenting):

I respectfully dissent for I cannot place my imprimatur on a decision which fails to perceive the realities of the racial and religious discrimination presented by the facts of this case, which implicitly if not explicitly emasculates prior Fifth Circuit cases, which I believe were rightly decided, and which cannot be squared with controlling Supreme Court precedent.

### Part I

My position is reflected by all that I said in my opinion for the Court 521

F.2d 344, when this case was originally considered and which I readopt.

In this opinion I referred numerous times to the test of significant state involvement. I think that is a proper test. Judge Coleman makes the point in his dissent, carried forward into his opinion for the en banc court, that any lease is "significant state involvement." The answer to this is, of course, that our concern is with legally significant involvement and not with involvement in a *sine qua non* sense. Whether involvement in the "but for" sense is of sufficient legal significance requires case by case analysis.

## Part II

At the outset as we get underweigh from the starting bouy in assaying the Court's en banc opinion, several things should be gotten out of the way. First, the Court, with expected candor, assumes at least *arguendo* that Golden, the Jew, and Fincher, the Black, have standing to challenge the racial-religious discrimination practices of BBYC.[1]

Second, and even more important, the Court recognizes[2] that the District Judge found racial-religious discrimination in the membership policies of the Club, as indeed it had to in the face of the findings and conclusions of the District Judge which are above the Plimsoll line of F.R.Civ.P. 52(a) and which were clearly mandated both by the testimony of the officers of BBYC[3] and its By-Laws[4] which did not recognize the right of any person Black, White, Christian, Jew or Moslem to "apply" for member-

---

1. The Court states:
   "It may be that the standing of Fincher and Golden was too thin. *See, e. g., Rizzo v. Goode* [1976, 44 U.S.L.W. 4095] 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561. We have concluded, however, not to allow this point to decide the disposition of the appeal.
   530 F.2d page 23.

2. The Court states:
   "The [District] Court nowhere specifically found as a fact that either [Golden or Fincher] was rejected on account of race or religion. It did say that their inability to get a recommendation amounted to a rejection and thus gave them standing to challenge the membership policies of the club. It did not [*express the findings of*] fact that their inability to get a recommendation was caused by reasons of race or religion. That the Court thought so reasonably appears, however, from the opinion, considered as a whole."
   530 F.2d page 23.

3. The Judge stated:

   With these [demographic] figures in mind, it taxes credulity that the defendant Club can state without reservation that it practices no discrimination and yet, at the same time, is unable to state whether it has ever had a Black or Jewish member in its eighty-six years of operation. 370 F.Supp. at 1043. The court concludes that plaintiffs have not been afforded the same rights to membership as their White and Christian counterparts. Id. The facially neutral policy before the court is the sponsorship method of membership in the Biscayne Bay Yacht Club. While the sponsorship requirement is applicable to Black and White

and Jew and Christian alike, in a club whose members from inception have been only White and Christian, the effect of the sponsorship requirement is to deny Blacks and Jews any meaningful opportunity for membership. (Citations omitted). Id.

4. The By-Laws in pertinent part provide:
   ARTICLE VI
   ELECTION OF MEMBERS
   Sec. 1. INVITATION TO MEMBERSHIP. Membership as to all classes of members except Life, Ex-officio, and Juniors qualified to transfer subject to Article V, Section 6, shall be attained by the following procedure:
   A. A candidate for membership shall have three sponsors who shall file with the Secretary letters by each of them concerning his or her qualifications therefor, to go with a form to be furnished by the Secretary to the sponsors upon application for the same, whereon detailed data concerning the candidate will be set forth and signed by each of the sponsors.
   B. Promptly upon receipt of the form and accompanying letters of the sponsors, the Secretary shall send out a notice to all Senior and Life members giving:
   1. The name of the candidate.
   2. His or her sponsors.
   3. The date upon which the Membership Committee will next meet to consider all candidates.
   C. Any Senior or Life member wishing to express his views concerning a candidate may so do in writing (to be held strictly confidential) by delivering his letter to the Secretary prior to the next Membership Committee meeting, or he may appear in person before such committee and present

ship. They restricted processing of prospective memberships to 3 sponsors who could extend an "invitation" when, and only when, the eightman membership committee had approved the candidate under a structure which made the three-man blackball pennant a final rejection after which virtually all of the supporting materials were to be destroyed.

Thus we are faced squarely with the problem of whether, in the operation of BBYC and its essential dependence on its mooring docks which rest not only on the bay bottom but are bottomed on the essential lease from the city, there is sufficient state involvement under § 1983.

The majority court, misled perhaps by the trial court's conclusion (No. 4) that there was no "evidence . . . before the court that defendant City of Miami was aware of the discrimination practiced by" BBYC, 370 F.Supp. at 1044, made as a prefatory remark to denial of relief against the Mayor and City Commissioners,[5] gives the impression that all

·of this was a great big shock to the City of Miami and it was completely innocent of what was going on or, more significantly, what was said was going on in terms of violation of peoples constitutional rights.[6]

But this is far from correct. Although it must readily be conceded that at the time of the initial 1962 lease the City had no record-established awareness of the membership policies of BBYC or even an awareness, *cf. Wood v. Strickland,* 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214; *Scheuer v. Rhodes,* 1974, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 that § 1983 would be judicially orbited to its current apogee, much water has gone over the dam in the intervening years to bring this sharply to the consciousness of the City Fathers. Indeed, at that very time, the City was acutely aware of the limitations to public use imposed by the 1949 deed from the Internal Improvement Fund, State of Florida.[7]

---

his views. Immediately following final action by the Membership Committee regarding any candidate, the Secretary shall destroy all letters received regarding such candidate, with the exception of the letters of the sponsors, which shall remain in the file of the Secretary.

D. The Board of Governors, acting as a membership committee, shall after due investigation vote by secret ballot on each candidate, but not until at least thirty (30) days have elapsed after notice has been mailed by the Secretary to the Senior and Life members with respect to such candidate. The board shall not sit as such membership committee unless at least eight members are present, and no invitation to membership shall be extended if as many as three members of said committee shall vote unfavorably on the candidate. If the Membership Committee fails to approve a candidate after such secret ballot, he or she shall not be eligible to be considered again until the expiration of twelve months from the date of such disapproval.

E. If the Membership Committee approves a candidate for invitation to membership, the Secretary shall advise the sponsors and then, and not until then, may the sponsors extend the invitation to the candidate, and they shall report to the Secretary whether the invitation has been accepted; and if accepted, the Secretary

shall confirm to the candidate the invitation and acceptance, and the membership of the club shall be advised thereof in the next monthly notice.

5. The Court states:

No evidence being before the court that defendant City of Miami was aware of the discrimination practiced by the Biscayne Bay Yacht Club which would require the City to terminate its lease, and assuming that defendant Biscayne Bay Yacht Club will comply with the court's Order and immediately cease its discriminatory practices, no relief is appropriate against defendant mayor or commissioners. 370 F.Supp. at 1044.

6. No appeal was taken from this part of the order so we are not faced here with the problem of the scope and nature of relief available against erring municipal officials, either in their personal or official capacities, as "persons" under § 1983 on which the Court en banc has recently ruled. *See Muzquiz v. City of San Antonio,* 5 Cir., February 27, 1976, 528 F.2d 926 (en banc), original panel opinion 520 F.2d 993; *Warner v. Board of Trustees of the Police Pension Fund Of The City of New Orleans et al,* 5 Cir., February 27, 1976, 528 F.2d 505, original panel opinion 522 F.2d 1384.

7. The Deed from the Internal Improvement Fund to the City of Miami (Plf. Ex. 11) states:

PROVIDED, HOWEVER, anything herein to the contrary notwithstanding, this deed is giv-

Because the 1962 lease was expressly subject to these conditions, the parties sought and obtained from the Trustees of the IIF a release of the restriction in the 1949 deed "limiting the use of the lands conveyed therein to municipal purposes". In the waiver IIF found that such "improvements will help relieve the acute shortage of public dock facilities existing in the City of Miami." The waiver was effective during the life of the lease but to "terminate and cease to be effective upon cancellation or termination of the lease". The waiver, however was subject to specific conditions which, if not then readily recognizable as significant, became so by the events of 1968 and the renewal of the lease in 1970.[8]

Now enters Golden, the persistent, tenacious advocate for the obliteration of the last vestiges of state ordained racial or religious discrimination. Through his appearances before agencies of the city, if not the City Commission itself, Golden took a major role in drafting the ordinances[9] designed to prevent racial and religious discrimination which by their terms became a part of this and other similar leases by the City of public property.

By the ordinance adopted 13 June 1968 (amended with no significant changes as to this case July 11, 1968) the City in language which would do credit to a Bicentennial constitutionalist declaring in the prefatory whereas preamble the necessity "that all of its residents be afforded equal opportunity and protection under the Constitution and Laws of this nation" and reaffirming its policy to "properly protect all of its citizens regardless of race, creed, religion, color or national origin, in their basic constitutional rights", adopted a far reaching but highly specific act ordaining in Section 1 that the lessee of any property by the City will not discriminate against or "shall not discriminate against or refuse or deny to any person or persons, guests or permittees, the use of facilities leased from the city because of race, creed, religion, color or national origin". The ordinance then set up a detailed code opening up any such lessee club or organization to all persons without discrimination and prescribing the conditions and requirements for the operation of such lessees in their membership policies and practices. Of unusual importance was the statutory declaration (Section 3) that the ordinance "being a implementation of the provisions of the Constitution of the United States of America . . . , said provisions are to be considered a part of every such lease as described . . . regardless of the specific writ-

---

en and granted upon the further express condition subsequent that the Grantee herein or its successors and assigns shall never sell or convey or lease the above described land or any part thereof to any private person, firm or corporation for any private use or purpose, it being the intention of this restriction that the said lands *shall be used solely for public purposes*, including municipal purposes and not otherwise.

PROVIDED, FURTHER, anything herein to the contrary notwithstanding, this deed is given and granted upon the further express condition subsequent that the Grantee herein or its successors or assigns shall not give or grant any license or permit to any private person, firm or corporation to construct or make by any means, any islands, fills, embankments, structures, buildings or other similar things *within or upon* the above described lands or any part thereof *for any private use or purpose*, as distinguished from any *public or municipal use or purpose*. (emphasis supplied).

**8.** Provided, however, that this Waiver is executed subject to the following conditions:

(1) The City Commission retains the authority to cancel said lease agreement in the event any development would occur in the operation by the lessee of the leased premises which is *inimical to the general public interest*.

(2) That the City Commission of the City of Miami retains the authority to cancel said lease agreement in the event of a need for the leased lands for public purposes other than the *municipal purposes* found herein. (emphasis supplied)

**9.** Acting perhaps as a sealawyer, Golden did the original drafts of these ordinances but the final drafts were prepared by the City Attorney's office. R. at 28, 35.

ten terms of any lease now existing or to be entered into in the future".[10]

But Golden did not rest upon his oars. Convinced that these ordinances were

---

**10.** Section 1. That the lessee of any property of which the City of Miami is the owner shall not discriminate against or refuse or deny to any person or persons, guests or permittees, the use of the facilities leased from the City because of race, creed, religion, color or national origin.

Section 2. That in order to facilitate the implementation of the policy of the City of Miami as set forth in Section 1, in instances wherein leases are entered into between the City of Miami and organizations or clubs for the use of City property or City facilities by the members thereof, said organizations or clubs shall comply with the following requirements:

A. *Membership* —

I. Membership in the said club or organization shall be available to all persons without discrimination as defined in Section 1 hereof.

II. There shall be no requirement that applicants for enrollment be sponsored by anyone as a condition to such applicant being processed or accepted for membership.

* III. The club or organization shall make a minimum of five per cent of existing enrollment of the various types of membership in such club or organization available for new enrollment for a minimum period of thirty days of each year, the first such enrollment period to commence September 1, 1968. In the year 1969 the enrollment period shall commence July 1st of each year thereafter. In the event there is more than one type of membership available, this shall mean five per cent of each type of membership shall be open to the general public.

IV. Acceptance into membership shall be determined by simply majority vote of the general membership at a meeting designated for such purpose, and there shall be no secret ballot for admission to membership.

V. In the event there are a greater number of applicants than there are openings available for membership under the annual five per cent of enrollments as set forth above, then, and in that event, new members in this enrollment period shall be selected by lot.

*VI. Within the thirty day period prior to the date of the commencement of the enrollment period described above (sub-section III), the club or organization shall advertise twice in two daily newspapers of general circulation published in the City of Miami a notice of the acceptance of new members as hereinabove provided, and notice of the purposes of the club or organization and of the programs offered by the club or organization to the public. Said notice for the year 1968 shall be printed on the first and fourteenth days of August. For the year 1969 the notice shall be printed on the first and fourteenth days of June, and on the first and fourteenth days of June of each year thereafter.

B. *Dues* — All members in each of the various categories of membership shall pay equal dues, if any, within said categories

. . .

C. *Minutes of Meetings* — All minutes of meetings, whether regular meetings or special meetings, or however designated, of said club or organization shall be posted upon the bulletin board upon the club premises within thirty days after the date of such meetings, and a copy thereof shall be forwarded to the City Manager of the City of Miami, or his designee.

D. *Privileges* — All members in each category shall have equal rights and privileges.

Section 3. The foregoing matters as set forth in Section 1 and 2 above being an implementation of the provisions of the Constitution of the United States of America and the Constitution of the State of Florida, said provisions are to be considered a part of every such lease as described above entered into between the City of Miami and any person, firm, corporation, club or organization, regardless of the specific written terms of any lease now existing or to be entered into in the future.

Section 4. That any person, firm, corporation, club or organization violating the terms and conditions of this ordinance shall be subject to having its lease forthwith terminated by the City of Miami for said violation, upon due notice to the violator and upon an opportunity to be heard before the Commission of the City of Miami concerning said violation.

Section 5. That all ordinances, code sections or parts thereof in conflict herewith, insofar as they are in conflict, are hereby repealed.

Section 6. If any section, sentence, clause, phrase or word of this ordinance is for any reason held or declared to be unconstitutional, inoperative or void, such holding or invalidity shall not affect the remaining portions of this ordinance; and it shall be construed to have been the intent of the Commission of the City of Miami to pass this ordinance without such unconstitutional, invalid or inoperative part therein; and the remainder of this ordinance, after the exclusion of such part or parts, shall be deemed and held to be valid as if such parts had not been included herein.

Section 7. This ordinance is hereby declared to be an emergency measure upon the ground of urgent public need for the preservation of

not being complied with by BBYC he began a long, and at least at this point, unsuccessful battle to vindicate these rights. Before taking formal action, Golden informed the City Attorney of the ordinance violations by the club by letter to which there was no reply.[11] Thereafter he appeared before the City Commission with no success.[12]

In the meantime BBYC sought and on March 6, 1970 obtained an amendment to the 1962 lease for approximately one additional acre of adjacent land to "permit construction of additional concrete dock and timber mooring piles . . . being an extension of the existing dock. . . ." The amendment was expressly made subject to the restrictions imposed by IIF in the 1962 waiver (see note 8 *supra*)[13] Again, IIF granted a waiver on the same prescribed conditions.

Despairing of his failure in the municipal-legislative approach and presumably unwilling to see his constitutional craft strand on municipal inaction Golden filed in April of 1970 a petition for writ of mandamus in the state Circuit Court of Dade County against the City of Miami. In it he asserted under oath his failure to obtain admission to BBYC because of the procedure requiring 3 sponsors (see Note 4 *supra* and accompanying test). He then set forth the specific requirement of the July 1968 ordinance (see Note 10 *supra*) requiring lessee clubs to admit new members one month of the year without requirement of sponsorship and the fact that BBYC has failed to comply with the ordinance and the City has failed to invoke the penalty despite demand and personal appearance by Golden before the City Commission. He sought cancellation of the lease as the ordinance provides. The prayer was for an "Alternative Writ of Mandamus requiring the Respondent [the city] to enforce the above mentioned ordinance and to require [BBYC] to comply with the said ordinance or to show cause . . . why it should not enforce" the ordinance. The City responded by motion to quash and on September 15, 1970 Circuit Judge Cullen by an unilluminating order granted the motion to quash but, of great importance, expressly prescribed that it was "without prejudice to bring such appropriate action as may be available to petitioner". Presumably unwilling to run any risk of exhaustion of remedy as a prelude to a § 1983 suit as an "appropriate action" Golden then appealed to the District Court of Appeals which affirmed without opinion.

Came then the instant § 1983 suit in February 1974, 6 years after Golden, as Mordecai at the gate, had initiated his lamentation and helped lobby the enactment of the ordinance, 4 years after the execution of an amendatory lease, and 2 years after the City had positive notice through the mandamus proceeding that BBYC, as lessee, was engaging in claimed denial of membership on the basis of race and religion.[14]

This continuation of the relationship between the City and BBYC—whether by formal extension of the lease or ac-

---

peace, health, safety and property in the City of Miami, and the requirement of reading this ordinance on two separate days is hereby dispensed with by a vote of not less than four-fifths of the members of the City Commission.

\* The sections of Ordinance 7668 which are asterisked appear as amended by Ordinance 7682 which was adopted July 11, 1968. In addition to amending the two sections of 7668 indicated above, Ordinance 7682 includes the following pertinent section:

Section 6. This ordinance is hereby declared to be an emergency measure upon the ground of urgent public need for the preservation of peace, health, safety and property

in the City of Miami, and the requirement of reading this ordinance on two separate days is hereby dispensed with by a vote of not less than four-fifths of the members of the City Commission.

11. R. at 36–37.

12. R. 27–28.

13. These became conditions 1 and 2.

14. The District Court noted "that the City has adopted a resolution deferring any extension of the lease with the Club pending this decision." [370 F.Supp. at 1044] (See Plf. Ex. 12, R. 63)

quiescence in its continued enjoyment—in the light of the charge and now judicially credited fact of racial-religious discrimination demonstrates that this is state action whether viewed as *Moose Lodge*,[15] *Burton,* or an amalgam of them with *Gilmore.* Whatever its motive—and this is irrelevant in § 1983—the City has inescapably insinuated itself into the continued availability of an essential facility which it knows now is operated to exclude nonmembers, which is to say Jews and Blacks. *See Burton v. Wilmington Parking Authority,* 1961, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45, 52. There is thus a confluence of state participation in the relationship and state participation in the discrimination itself. *See New York Jaycees, Inc. v. United States Jaycees, Inc.,* 2 Cir., 1975, 512 F.2d 856, 858 *citing, Powe v. Miles,* 2 Cir., 1968, 407 F.2d 73, 81; *Jackson v. Metropolitan Edison Co.,* 1974, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477.

Although motive may be irrelevant to § 1983 liability, the interplay of city and club purposes in this case has a significant impact on the result of the assay for *Burton* synergism. Indeed, the enhancement of causes and effects which take place here orbit about BBYC's racial and religious discrimination. The consideration passing to the city for granting the club the exclusive use of this segment of scarce bay bottom space is not the token $1 per year. It is the assurance that BBYC's white non-Jewish members will be able to moor their yachts at docks on this state-owned land instead of at an overcrowded public pier. For its part, BBYC attorns its annual $1 because it needs this public bay bottom like a dead man needs a coffin. Without this public property it may continue to be a club, but it certainly will not continue to be a yacht club.

## Part III

Of course this case presents in stark form the anomaly of there being significant state action through the municipality while the municipality (and perhaps its animate functionaries, *see* note 10 *supra*) has effective immunity as a non "person" under § 1983. *City of Kenosha v. Bruno,* 1973, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109. *See also Moor v. County of Alameda,* 1973, 411 U.S. 693, 95 S.Ct. 1785, 36 L.Ed.2d 596; *Monroe v. Pape,* 1961, 365 U.S. 167, 188–93, 81 S.Ct. 473, 484–87, 5 L.Ed.2d 492, 505–07. But nonetheless the ordinance (note 10 *supra*) is of unusual significance. Its incorporative provision (Section 3) means that the terms of the ordinance are read into the lease. The ordinance imposed burdens both on the city, as lessor, and the lessee, BBYC. Each was subject to the stringent mandates against racial and religious discrimination and the means adopted by the legislative body as a reasonable way by which to achieve the mutually adopted goals.

Under the structure of the ordinance and lease made under and subject to it, the lessee was burdened down with all of the prohibitory and affirmative mandates, except possibly the obligation or responsibility of initiating criminal prosecutions or overseeing the exaction of such penalties.

Of course, enforcement of city policy, reflected by its unchallenged ordinances is the very essence of municipal government. Under the construct of the ordinance (and the lease) substantial responsibility for compliance fell directly on the lessee. The situation is, of course, not a complete parallel, but as the Supreme Court has recently said in *Jackson v. Metropolitan Edison Company:*

> We have of course found state action present in the exercise by private enti-

---

**15.** What *Moose Lodge* involved was the right of guests, not those seeking membership, 407 U.S. at 170–71, 92 S.Ct. at 1970, 32 L.Ed.2d at 636 a significant difference from those claiming the right to compete for membership for use of facilities which could not exist without the City lease.

ty of powers traditionally exclusively reserved to the State. 1974, 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477, 485 *citing, Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458 (1932) (election); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (election); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); *Evans v. Newton,* 382 U.S. 296, 88 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park).

We have long ago applied such principles in race civil rights cases.

Indeed, the State of Florida laid this down in the initial conditions it imposed, see note 8 *supra,* which required that the lease be terminated if operations under it become "inimical to the general public interest." The city and BBYC having expressly covenanted to a policy of non-racial-religious discrimination and the institution of a club-organization structured to achieve this equality became equally bound in the eyes of the law either to (i) correct the asserted deficiencies or (ii) terminate the arrangement. The fact—now undisputed—is that the city turned both an advocate and deaf ear to these repeated complaints—now judicially credited—which makes *Baldwin v. Morgan,* 5 Cir., 1958, 251 F.2d 780, 788 directly applicable. We said:

> State action is indeed required under the Fourteenth Amendment and 42 U.S.C.A. § 1983. But those who directly assist the admitted state agency in carrying out the unlawful action become a part of it and subject to the sanction of Section 1983.

In holding the club responsible, I go beyond ordinary principles of agency or landlord-tenant. Rather with the sweep of § 1983 and the aims of that legislation

it rests upon the necessity of preventing persons from hiding behind private discrimination which is not reachable by the Constitution when from mutually interacting conduct the resulting enterprise is infected by significant governmental action.

Of course a municipality may engage in conduct which amounts to state action even though under *Kenosha* there is practical immunity as a non-person. But those animate persons who are engaged in significant parts of such activity and who reap the benefits of it are amenable under § 1983 for appropriate relief.[16] The amenability of a private party under § 1983 for conduct which is significantly attributable to government is not based on an imputed principle of agency or the like but on the ground that, as § 1983 itself says, "Every person" shall be liable to the injured party. Thus that liability is not confined to some governmental official, but frequently is imposed against, for example, operators of retail stores, restaurants, hotels, buses and the like.[17]

Of course in the ordinary situation the liability of private persons flows from the unconstitutional municipal ordinance or practice in certain discriminatory actions. Here, unlike an ordinance which imposes an unconstitutional burden upon someone in the private community, this ordinance imposes a continuing burden on both the City as lessor and the BBYC as lessee to carry out the mandate of non-discrimination. Without suggesting that as a universal matter failure to enforce constitutes sufficient state action, we have already decided that failure on the part of municipality to take action where needed constitutes state action. In *Jennings v. Patterson,* 5 Cir., 1974, 488 F.2d 436, private individuals erected a barricade across a street, which was

---

**16.** As to "appropriate" relief see Note 6 *supra.*

**17.** *Adickes v. S. H. Kress & Co.,* 1970, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142; *Goodloe v. Davis,* 5 Cir., 1975, 514 F.2d 1274; *Cason v. City of Jacksonville,* 5 Cir., 1974, 497 F.2d 949, 950; *Jennings v. Patterson,* 5 Cir., 1974, 488 F.2d 436, 438; *Hall v. Garson,* 5 Cir.,

1970, 430 F.2d 430, 442–43; *Baldwin v. Morgan,* 5 Cir., 1958, 251 F.2d 780, 787; *Derrington v. Plummer,* 5 Cir., 1956, 240 F.2d 922, *cert. denied,* 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719; *Browder v. Gayle,* M.D.Ala., 1956, 142 F.Supp. 707, *aff'd,* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.

publicly owned and the City refused to remove the barricade. Judge Roney in writing the opinion of the majority related this nonfeasance concept to § 1983 and his words are particularly persuasive:

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies" *Monroe v. Pape,* 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492, 501. Accordingly, we hold *that the failure of the City and its governing officials to dismantle the fence constitutes state action proscribed by Section 1983.* (emphasis supplied).

*See also Azar v. Conley,* 6 Cir., 1972, 456 F.2d 1382, 1387: *Ingram v. Dunn,* N.D. Ga., 1974, 383 F.Supp. 1043, *affirmed,* 514 F.2d 1070; *Minshew v. Smith,* N.D. Miss., 1974, 380 F.Supp. 918, 922; *cf.* Civil Rights Cases, *supra* ; *Bell v. Maryland,* 1964, 378 U.S. 226, 309–11, 84 S.Ct. 1814, 1859–1860, 12 L.Ed.2d 822, 845–846.

Although the barrier which blocks these parties access to the Biscayne Bay Yacht Club may be less physically [18] evident than in *Jennings* it is nevertheless there as well as the racial and religious animus which it represents. And the City's failure to remove it clearly constitutes complicity in the enterprise of suf-ficient magnitude to satisfy even the most conservative state action standards.

Likewise, the extension of the lease or the continuation of the enjoyment of it in the face of now judicially established discrimination, quite without regard to affirmative cancellation by the City, made the BBYC a participant in the discrimination.

### Part IV

It is as though the city in its contract had expressly recited that it leased the property to BBYC, an exclusively White non-jewish organization, for the *exclusive* use of its members and guests. *Gilmore v. City of Montgomery,* 1974, 417 U.S. 556, 566, 94 S.Ct. 2416, 2422, 41 L.Ed.2d 304, 315–17.

*Gilmore* clearly proscribes the *exclusive* use of public property by racially discriminatory organizations. The primary consideration should be whether this Court is willing to condone the State's participation in, and approval of, racial discrimination by allowing public property to be utilized in this enterprise.[19]

In *Gilmore* the Supreme Court emphasized that the city policies permitting exclusive use of city facilities by segregated schools operated to contravene an existing school desegregation order, just as the discrimination in this case violated the clear mandate of the ordinance-lease. *Gilmore, supra* 417 U.S. at 568, 94 S.Ct. at 2423, 41 L.Ed.2d at 316. The Court noted that "the city's officials were

---

**18.** It may be not less, but more. Access to the driveway leading into the club's landbased grounds is not what made BBYC a great nautical organization. For a club which has long-established races such as the Sir Thomas Lipton *Challenge Cup Race, The Miami-Montego Bay Race,* the St. Petersburg-Venice Lauderdale Race, the notion that the club could be land-locked without mooring facilities would be a disservice to the memory of the pre § 1983 ambitions of Commodore Munroe.

**19.** Mr. Justice Blackmun writing for the majority explained the exclusive use concept as follows:

Here, the exclusive use and control of city recreational facilities, however temporary, by private segregated schools was little different from the city's agreement with the YMCA to run a "coordinated" but, in effect, segregated recreational program. Such use and control carried the brand of "separate but equal" and, in the circumstances of this case, was properly terminated by the District Court.
417 U.S. at 567, 94 S.Ct. at 2423, 41 L.Ed.2d at 316.

aware of this [desegregation] order and were responsible for seeing that no actions on their part would significantly impede the progress [of desegregation]. . . . ." *Id.* In *Golden* the city's lease with BBYC, and its refusal to recognize the Club's restrictive membership, operates to contravene the city's own anti-discrimination ordinances. The City of Miami officials were aware of the policy expressed by the ordinance and had a duty to take no action, such as leasing city property—or now more important, the extension of the lease—that would contravene the requirement that all city lands be used in a non-discriminatory manner.

*Gilmore* does not state that a segregated group can never use public facilities. Rather it emphasizes that such an organization cannot have exclusive use and control of city-owned property. This is what the BBYC lease permits—exclusive use of city property by a racially and religiously restricted group. That this is sufficient to find state action is indicated by *Gilmore* in that if "the city or other governmental entity rations otherwise freely accessible recreational facilities, the case for state action will naturally be stronger . . . ." *Gilmore, supra* 417 U.S. at 574, 94 S.Ct. at 2426, 41 L.Ed.2d at 320.

## Part V

Today the Court opens the door to subterfuge because well within the bounds of this opinion, a governmental entity may accomplish indirectly what it could never do directly by leasing public property to a private segregated organization and then disavowing any direct participation in the discriminatory membership policies.

This sort of subtle method of effectuating racial and religious discrimination has been specifically rejected by the Supreme Court in *Gilmore* and by this Court in *Wimbish v. Pinellas County, Florida,* 5 Cir., 1965, 342 F.2d 804 and *Derrington v. Plummer,* 5 Cir., 1956, 240 F.2d 922, *cert. denied,* 353 U.S. 924, 77 S.Ct. 682, 1 L.Ed.2d 719, where we refused to allow public property to be leased to segregated organizations.

## Part VI

The court's response to its own question why the District Court did not cancel the "offending appendage and simply enjoin the use of the docks" [20] was, that it was probably influenced by the practical result that docks cut loose would be useless. That answer ignores the whole record. The docks are an integral part of a yacht club if it is not one in name only. Because they are indispensable to the operation of a yacht club worthy of the nautical traditions of this organization and they do not exist without the essential governmental lease, the plaintiffs seek not just to tie up at the docks, but to moor their vessels at the dock as a part of the yacht club and thereby enjoy all of the privileges of membership until such time as the State cuts itself altogether free from the enterprises.

The Court's argument that there were other docking facilities, both public and private on Biscayne Bay, available to plaintiffs is not an acceptable one in assaying denial for proscribed reasons. As to use of facilities which cannot operationally exist without State action, the same argument has been made and rejected in the cases of public golf courses, swimming pools, public auditoriums and the enjoyment of segregated seats on a city bus.[21]

**20.** *See* 530 F.2d pages 21–22, *citing Wright v. City of Brighton,* 5 Cir., 1971, 441 F.2d 4147; *United States v. State of Mississippi,* 5 Cir., 1974, 499 F.2d 425.

**21.** *Beal v. Holcombe,* 5 Cir., 1951, 193 F.2d 384, *cert. denied,* 1954, 347 U.S. 974, 74 S.Ct. 783, 98 L.Ed. 1114 (golf course); *St. Petersburg v. Alsup,* 1956, 238 F.2d 830, *cert. denied,* 1957, 353 U.S. 922, 77 S.Ct. 680, 1 L.Ed.2d 719 (swimming pool); *Bynum v. Schiro,* E.D.La., 1963, 219 F.Supp. 204, 209, *aff'd,* 375 U.S. 395, 84 S.Ct. 452, 11 L.Ed.2d 412 (municipal auditorium); *Browder v. Gayle, supra* at 717 (city bus); *New Orleans City Park Improvement Association,* 5 Cir., 1958, 252 F.2d 122, 123 (city park facilities).

## Part VII

The majority places emphasis on our recent decision in *Greco v. Orange Memorial Hospital Corp.*, 5 Cir., 1975, 513 F.2d 873 which, of course, also concerned the lease of public land by a private entity.

In writing the opinion for the Court when this case was first considered I distinguished *Greco* on the obvious ground that it did not involve racial discrimination which is a realm of law where courts have consistently and readily found state action. *See Golden v. Biscayne Bay Yacht Club, supra,* at 326–29.

But *Greco* is also distinguishable on its facts for there the Court stressed that the lease from the city had not included any condition relating to the performance or non-performance of elective abortions.[22] In contrast, both the BBYC lease by way of city ordinances incorporated therein, (see note 10 *supra*) and *Burton* had specific provisions barring racial discrimination, and at the very least the club had a duty to perform its obligations in accordance with the terms of the lease.

## Part VIII

In wrapping this up some additional comments are appropriate. We understand the majority opinion to hold that the fact that a private club leases some of the property it uses from a governmental entity is not enough in itself to imbue the private club's discriminatory activities with "state action." Whatever the validity of that holding as a legal proposition, we are convinced that the result reached by the majority is incorrect, because several unique factors relating to this particular lease were not properly taken into account in the majority opinion.

The panel opinion, 521 F.2d 344, as does this dissent, discussed these special considerations which mandate the conclusion that "much more is involved than simple ownership and lease" 521 F.2d at 352. This was a lease of waterbottom land abutting very valuable property—we can take judicial notice that this lease was worth considerably more than $1.00, and thus that the financial accommodation here had the same effect as would a fair market value lease combined with a large subsidy given from the city to the club. The lease arrangement between the club and the city was grounded, pursuant to a state requirement, on a condition that the club would be performing a "public purpose," *viz.,* providing private dock space which would to some extent relieve the overcrowded public docks. The city at one point had recognized, through ordinance, that as trustee of a limited and valuable public resource, it had an obligation to insure that any private clubs given exclusive access to parts of that resource would not practice invidious discrimination. The club failed to comply with that ordinance, although the prohibition of invidious discrimination had been made part of the lease, and the city refused to enforce the ordinance, despite clear notice of the violation.

This Court need not decide whether any one of these considerations, standing alone, would be sufficient to support a finding of state action. Rather, we need only pass on whether the cumulation of these considerations develops an image of "significant state involvement." For us, all the facts and circumstances lead to only one conclusion—the cumulation of the various aspects of the city-club relationship colors the club's policies of racial and religious discrimination with state action. The majority has reached a different result by failing to consider all

---

22. The Court stated that:

There is no evidence that in acquiring federal funds or in leasing the hospital facility the corporation ever accepted a condition relating to the performance or non-performance of abortions. *Doe v. Bellin Memorial Hospital,* 479 F.2d 756, 761 (7th Cir. 1973). The Parking Authority in *Burton,* on the other hand, was specifically obligated to operate in a non-discriminatory manner.

the relevant factors, so today's opinion should not be read to foreclose a finding of state action in similar circumstances in the future. The "no state action" harbor for the Club's white non-jewish yachts is constitutionally unsound, and we would give them no berth.

The District Court should be AF-FIRMED.